**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 98-8087

DEAN KELLY DAVIS,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D. Ct. No. 97-CR-133-B)**

James H. Barrett, Assistant Federal Defender, Cheyenne, Wyoming, appearing for Appellant.

James C. Anderson, Assistant United States Attorney (David D. Freudenthal, United States Attorney, with him on the brief), Cheyenne, Wyoming, appearing for Appellee.

Before **TACHA** , **MCKAY** , and **HENRY** , Circuit Judges.

**TACHA** , Circuit Judge.

Dean Kelly Davis appeals from the district court's order denying his motion to suppress evidence found in his home. The evidence, which Davis claims was

obtained during the course of an unreasonable arrest and without valid consent, resulted in his conviction under 18 U.S.C. §922(g)(1) of being a felon in possession of a firearm. We exercise jurisdiction pursuant to 28 U.S.C. §1291 and affirm.

## I. Standard of Review

Reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous. United States v. Gama-Bastidas, 142 F.3d 1233, 1237 (10th Cir. 1998). We view the evidence in its totality and in the light most favorable to the government. Id. We review the ultimate reasonableness of a search or seizure de novo. Id. The voluntariness of consent is a question of fact and we review the district court's determination for clear error. United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994).

## II. Background

About 9:45 p.m. on August 2, 1997, Patrolman Flint Waters responded to a call reporting vandalism to an automobile. The complainant, Mandy Watson, told Waters that she and Davis, her estranged boyfriend, had argued earlier in the day and that Davis had said he intended to shatter her windshield. Watson also reported that Davis had threatened her and another individual in the past and often carried an SKS semi-automatic rifle.

Patrolman Waters examined Watson's vehicle and found that the

windshield had been shattered. He spotted a crushed beer can and a fresh flower amid the shards of glass. Waters also observed a footprint bearing a distinctive treadmark along the vehicle's hood.

That same evening, the police received another call involving Davis. This call reported a threat in progress, even as Waters and Watson were speaking. Kyle Duvall told the responding officer that Davis had phoned him and threatened physical harm, then appeared at his doorstep and demanded he step outside. When Duvall refused, he heard the sound of a bullet entering a rifle-chamber. Davis then said that someone was going to be shot and that he felt like shooting someone.

The responding officer radioed Duvall's story back to his dispatch. Patrolman Waters, Watson and other officers heard both this broadcast and the earlier threat in progress report. Waters also heard another broadcast reporting shots fired, which only later proved not to involve Davis. While responding to this broadcast, Waters received another call reporting that Davis was riding in a car driving behind him. The same information reached other officers who, with Waters, soon approached Davis near a crowded and frequently rowdy nightspot.

In view of the evening's reports, the officers conducted a "felony stop." The police removed Davis and the driver from the vehicle at gunpoint and handcuffed them. Both men showed signs of having been drinking, but were not

yet intoxicated.

Waters told the two men that the police were investigating a report of threats involving a gun. The driver consented to a search of the vehicle, and the officers found ammunition, speed loaders and a holster, but no gun. Waters noticed that Davis' shoes bore a treadmark that apparently matched the one that he had observed on Ms. Watson's vehicle. Waters advised Davis that he was not under arrest but read him his Miranda rights nonetheless. Davis then admitted that he and Watson had argued that day and that he had shattered her windshield.

Because a crowd had begun to congregate and make taunting remarks, the officers decided to continue their questioning of Davis at headquarters. They asked whether he would accompany them and Davis, still handcuffed, agreed. At the station, Waters asked Davis whether he owned an SKS rifle. Davis admitted that he kept such a rifle in his bedroom and gave Waters permission to seize it. He signed a consent to search form which, in plain language, advised him of his right to refuse. Davis then led the officers to his home and directed Waters to his bedroom. There Waters found an SKS semi-automatic rifle and one round of ammunition.

The district court found that 1) Davis' de facto arrest was supported by probable cause and 2) Davis' consent to the search of his home was fully informed and voluntary. We agree.

-4-

### III. Seizure and Probable Cause under the Fourth Amendment and Wyoming Law

The United States concedes that, notwithstanding Patrolman Waters' statement to Davis that he was not under arrest, Davis was effectively arrested. We must therefore determine whether Davis' arrest satisfied the requirements of the Fourth Amendment and Wyoming law.

### A. The Fourth Amendment

The Fourth Amendment prohibits "unreasonable . . . seizures." U.S. Const. amend. IV. An arrest is a "seizure" for Fourth Amendment purposes and is reasonable where there is probable cause to believe that an offense has been or is being committed. Henry v. United States, 361 U.S. 98, 102 (1959). Probable cause is measured against an objective standard. Beck v. Ohio, 379 U.S. 89, 96 (1964). It is evaluated "in relation to the circumstances as they would have appeared to prudent, cautious and trained police officers." United States v. McCormick, 468 F.2d 68, 73 (10th Cir. 1972). The "subjective belief" of an individual officer as to whether there was probable cause for making an arrest is not dispositive. Florida v. Royer, 460 U.S. 491, 507 (1983).

Davis concedes that the "felony stop" was reasonable but argues that his continued detention was not. We disagree. In light of the circumstances, the officers had ample cause to believe that Davis had violated Wyoming law.

Wyoming prohibits "property destruction and defacement," defined as "knowingly defac[ing], injur[ing] or destroy[ing] property of another without the owner's consent." Wyo. Stat. Ann. § 6-3-201(a) (1999). Wyoming also prohibits "breach of the peace," defined as "using threatening, abusive or obscene language or violent actions with knowledge or probable cause to believe [these] will disturb the peace." Wyo. Stat. Ann. § 6-6-102(a) (1999). Davis reportedly had threatened to shatter his estranged girlfriend's windshield and then admitted to having done so. Davis also reportedly had threatened Mr. Duvall over the telephone, appeared at his home demanding that he step outside, and announced that someone was going to be shot. Prudent, cautious, trained police officers could reasonably have believed that Davis had committed two crimes under these circumstances. Therefore, probable cause under the Fourth Amendment existed for the effective arrest of Davis.

## B. Wyoming Law

Under Wyoming law, a peace officer may arrest a suspect without a written warrant when "[t]he officer has probable cause to believe that a misdemeanor has been committed, that the person to be arrested has committed it and that the person, unless immediately arrested . . . [m]ay cause injury to himself or others or damage to property." Wyo. Stat. Ann. § 7-2-102(b)(iii)(B) (1999).

Davis concedes that concern might have been justified, but argues that

-6-

probable cause to expect continued criminal activity was dissipated by the absence of weapons. We find to the contrary. At the time the officers arrested Davis, they had probable cause to believe that he had committed "property destruction and defacement" and "breach of the peace." They also had reason to believe that Davis carried an automatic rifle. They had found ammunition, a holster and loaders, but had not found the gun. They had learned of an unfinished encounter with Duvall. Finally, they had found Davis under the influence of alcohol in a rowdy nightclub district. Under these circumstances the officers had ample cause under § 7-2-102 to believe that Davis had committed two misdemeanors and that he "may" have gone on to cause further injury or damage to person or property "unless immediately arrested." Therefore, Davis' effective arrest was justified under Wyoming law.

### IV.  Search and Consent under the Fourth Amendment

The Fourth Amendment also prohibits "unreasonable searches." U.S. Const. amend. IV. A warrantless search of an arrestee's home is per se unreasonable unless it falls within some well defined exception to the general rule. United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992). An arrestee's consent to the search qualifies as one such exception. Id. Consent must be "unequivocal and specific" and "freely and intelligently given." United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993). The government must prove the

satisfaction of these criteria in light of the totality of circumstances.    Id.  Where a

consensual search is preceded by a Fourth Amendment violation, the government

must prove not only voluntariness, but "'establish a break in the causal

connection between the illegality and the evidence thereby obtained.'"    Melendez-

Garcia , 28 F.3d at 1053 (quoting   United States v. Recalde  , 761 F.2d 1448, 1458

(10th Cir. 1985)).  We examine the entire record on appeal in determining

voluntariness.   United States v. Muniz  , 1 F.3d 1018, 1021 (10th Cir. 1993).

Davis argues that the consent which he gave to search his home was the

product of an illegal detention.  Absent any intervening event purging the

resultant taint, he contends that his consent was involuntary.  Again we disagree.

Davis' detention was not illegal.  Davis' arrest was supported by probable cause

and therefore could not "taint" his consent to the search of his bedroom.

Accordingly, we need only determine whether the district court clearly erred in

finding that Davis' consent was unequivocal, specific, and freely and intelligently

given.

The district court found at the suppression hearing that Davis had been

advised of his   Miranda  rights, had orally consented to the search of his bedroom

for his gun, and had signed a plainly drafted form advising him of his right to

refuse.  There is nothing in the record to indicate that Davis did not know what he

was doing, that he did not know of his right to refuse, or that he could reasonably

have feared any harm to himself in the event that he should exercise that right. Further, at trial Davis testified clearly to the knowing and voluntary nature of his consent, his awareness at the time of his right to refuse, his having directed Patrolman Waters to the precise location of his rifle, and even the reasons for his cooperation. We thus find that the district court did not commit clear error when it determined that Davis freely, intelligently, unequivocally and specifically consented to the search of his bedroom. Therefore, the search did not violate the Fourth Amendment.

## V. Conclusion

For the foregoing reasons we hold that 1) defendant's detention was neither unreasonable under the Fourth Amendment nor unwarranted under Wyoming Law, and 2) the search of defendant's home was the product of knowing, specific, unequivocal and uncoerced consent, and therefore was reasonable under the Fourth Amendment.

AFFIRMED.