**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 30, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JASON BROWN, a/k/a Hector
Burgos,

Defendant - Appellant.

No. 05-3400

(D. Kansas)

(D.C. No. 03-CR-40094-JAR)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

---

**PER CURIAM**.

---

Jason Brown, a/k/a Hector Burgos, entered a conditional guilty plea to

possession of cocaine hydrochloride with intent to distribute, in violation of 21

U.S.C. § 841(a)(1). Mr. Brown now appeals the district court's denial of his

motion to suppress the contraband. We exercise jurisdiction under 28 U.S.C. §

1291, and affirm.

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

# I. BACKGROUND

## A. FACTUAL BACKGROUND

At 1:30 a.m. on August 31, 2003, Mr. Brown parked his rented dark-colored Dodge Intrepid, entered the North Comfort Inn in Hays, Kansas, and asked the motel clerk if a room was available. He also inquired if any local restaurants were still open and if the motel had a pay phone he could use. The motel clerk answered in the affirmative to each of Mr. Brown's questions. Mr. Brown then used the motel's pay phone until approximately 2:35 a.m. Afterward, Mr. Brown left the motel to get something to eat. About ten minutes later, he returned and gave the clerk his credit card.

After successfully charging Mr. Brown's credit card and checking him in, the clerk handed Mr. Brown a room registration form. The registration form requested a vehicle license plate number and/or vehicle description from each hotel occupant. Mr. Brown filled out the form, save for the completion of his license plate number. Mr. Brown asked the clerk why he needed to provide this information. The clerk explained that the motel's safety policy required each guest's vehicle information be faxed to the police department.

At this point, Mr. Brown began acting strangely. He stated he no longer wanted a room if his vehicle information was going to be given to the police. When the clerk began to enter Mr. Brown's information into the computer, Mr. Brown asked him to delete it. The clerk told Mr. Brown that he could not

override the computer. Mr. Brown scribbled out his name and initials from the form, retrieved his credit card, exited the motel, and returned to his car.

Believing that Mr. Brown's actions were suspicious, the clerk called the police. While the clerk was on the phone, Mr. Brown reentered the motel and stated, "[i]f you're on the phone with the police, I'm going to kick your ass." Aple's Supp. App. at 28. Mr. Brown then drove away quickly, heading east on Interstate 70 ("I-70"). The clerk, who was still on the phone, reported this information to the police. Russell County, Kansas Deputy Sheriffs Bill Dollison and Karl Houk, who were on patrol in the same car, received a report from dispatch detailing Mr. Brown's erratic behavior at the motel. According to Deputy Houk, the report provided that a potential motel guest refused to provide his tag information, "ran out of the building stating . . . 'No, you're going to call the cops,'" and headed eastbound on I-70 in a dark-colored Dodge Intrepid. *Id.* at 112. Deputy Dollison considered this activity indicative of a vehicle theft, narcotics trafficking, or an outstanding arrest warrant, especially since the I-70 corridor is a high crime area.

When Deputy Dollison observed a dark-colored Dodge Intrepid heading east on I-70, he pulled behind it without activating the patrol vehicle's lights or siren. Shortly thereafter, he observed the vehicle cross over the fog line and onto the shoulder of the road "[t]hree or more" times over a flat and straight two-mile stretch of the highway. *Id.* at 43. According to Deputy Dollison, it was lightly

raining and windy, but he had no trouble staying within his own lane. In addition, Deputy Dollison testified that he did not see anything to explain the repeated strays onto the shoulder. At approximately 3:42 a.m., Deputy Dollison stopped the vehicle out of concern that the driver "might be tired, [or] possibly [be a] drunk driver, [or have a] medical condition." *Id.* at 78-79. The ensuing encounter was recorded by a video camera located in the patrol vehicle.

Deputy Dollison approached the vehicle from the driver's side and requested identification. Mr. Brown, whose hands were shaking, identified himself as "Hector Burgos" and provided a New York driver's license and the vehicle's registration. Mr. Brown also told Deputy Dollison that he was headed to New York City from "out west," that his father and sister were employees of the New York Port Authority, and that he had just been stopped and released by law enforcement.[1] *Id.* at 49-51. He further provided that he was in the floor-cleaning business, but he was wearing a white long-sleeved shirt, tie, slacks, and dress shoes. Mr. Brown also indicated that he rented the vehicle and handed Deputy Dollison a rental contract from Enterprise Rent-A-Car ("Enterprise"). Deputy Dollison noticed that, according to the rental contract, the vehicle was ten days overdue.

---

[1] Deputy Dollison later learned that Mr. Brown had been stopped by Sergeant Blain Dryden of the Hays Police Department. He did not know this at the time of the stop because the radios were on different frequencies.

Deputy Dollison then returned to his patrol car to check Mr. Brown's documentation. While doing so, dispatch informed him that "Hector Burgos" was not Mr. Brown's real name. Deputy Houk attempted to contact Enterprise regarding the expired rental agreement by calling a number listed on the agreement, but reached an automated message stating that the company's leasing office was closed until 8:00 a.m.

At 3:54 a.m., twelve minutes after the initial stop, Deputy Dollison issued Mr. Brown a written warning and returned his driver's license, the vehicle's registration, and the rental agreement. At this time, Mr. Brown's nervousness abated. The videotape of the traffic stop then shows Deputy Dollison telling Mr. Brown to "drive careful," and Mr. Brown replying "Thank you sir. Have a nice night." After taking three steps away from the vehicle, Deputy Dollison turned around and asked if Mr. Brown if he could conduct a search. Mr. Brown agreed, stating, "no problem" and "I don't have no narcotics."

Deputy Dollison's search of the car did not reveal any contraband; however, he noticed multiple air fresheners on the floor board, and a can of air freshener in the glove box. In the passenger compartment, he also observed two road atlases, a pair of freshly cleaned or recently purchased slacks, and a shirt.

In the trunk, Deputy Dollison found an air freshener placed atop a red gas can. The gas can's two spouts were sealed with duct tape. The trunk also contained two other air fresheners, two bottles of cleaning supplies, a couple of

-5-

squirt bottles, a pair of gray coveralls, two discs that appeared to be parts of a floor buffer machine, a white cloth mask, a bag of hanging clothes, and a shaving kit. Deputy Dollison later testified that the abundance of air fresheners caused him to suspect Mr. Brown was trying to mask the odor of something. Moreover, the unusual presence of a covered gas can in a rented vehicle made Deputy Dollison suspicious that there was a hidden compartment in the gas tank "[b]ecause if they put a false compartment in a gas tank, you lessen your volume of gas . . . so you need an extra supply of gasoline to get farther down the road." *Id.* at 59.

At 4:02 a.m., Deputy Dollison returned to his patrol car and phoned Sergeant Kelly Schneider. He informed Sergeant Schneider about the items in the car, the prior incident at the motel, and the expired rental contract. He also asked Sergeant Schneider to bring a drug dog to the scene.

At approximately 4:25 a.m., Sergeant Schneider called Deputy Dollison and told him that he could not bring the drug dog because his keys were locked in his patrol car. Sergeant Schneider then told Deputy Dollison, "we would probably need to have [the defendant] go down to the sheriff's department until we could contact the rental company to find out if the contract was still valid or not." *Id.* at 62. The videotape shows Deputy Dollison ending the conversation by telling Sergeant Schneider, "Well, we'll go ahead and take him on down to the sheriff's office until he can prove that you know, he actually belongs to the car and stuff.

Okay, we'll meet you at the office. Bye."

At approximately 4:30 a.m., the videotape shows Deputy Dollison telling Mr. Brown that there was "a problem with the rental agreement" and that the officers "needed" him to follow them to the sheriff's office in order to confirm his right to possess the vehicle. After Mr. Brown explained that he had called Enterprise and extended the agreement, the following exchange occurred between the officers and Mr. Brown:

Dollison: I see. Well, I'm going to need you to come down to the sheriff's office with me until we can get this thing straightened out. Alright?

Mr. Brown: Sheriff's office?

Dollison: Right. Until I can find out that you do have proof to have this car.

Mr. Brown: I do . . . that's the proof right there.

Houk: Hector, Hector, let me explain something that, he's trying to explain it to you but I don't know if he's getting it across. We get a lot of rental cars where people rent 'em for a day or a week, and don't take 'em back, you know. And all we've got to go by is when we see the rental agreement we check the dates. 'Cause see, without the paperwork we don't know that you actually legally have the car.

Mr. Brown: Oh, I legally have the car.

Houk: I know it, and that's what he's saying . . .

Mr. Brown: Call Enterprise. 1-800-Enterprise.

Houk: Yeah, that's what, that's what he's saying. If you'll just follow us down there that he'll make some phone calls and

> then . . .
>
> Mr. Brown: Alright.
>
> Houk: . . . it checks out . . .
>
> Dollison: Alright?
>
> Houk: . . . we'll turn you loose.
>
> Mr. Brown: Alright.
>
> Dollison: Okay? Okay, you'll follow us down there?
>
> Mr. Brown: Alright.
>
> Dollison: Okay.

Deputy Dollison testified that he "would have called Sergeant Schneider back" if Mr. Brown refused his requests, *id*. at 101, indicating that he did not intend to allow Mr. Brown to leave without authorization from Sergeant Schneider.

Mr. Brown then followed the officers to the Russell County Sheriff's Office. After Mr. Brown parked his car in the garage, Deputy Dollison re-obtained the rental contract and went into the office to contact Enterprise. Mr. Brown and Deputy Houk remained in the garage to smoke.

Deputy Dollison successfully reached the rental company by calling "1-800 Enterprise" and learned that Mr. Brown had extended the rental agreement. *Id*. at 68. Deputy Dollison then returned the contract to Mr. Brown, who had, at this point, left the garage and entered the office. After doing so, Deputy Dollison requested Mr. Brown's permission to search the vehicle a second time. Again,

-8-

Mr. Brown consented. Shortly thereafter, the officers discovered seven kilograms of cocaine hydrochloride stowed in a hidden compartment in the vehicle's gas tank.

## B. PROCEDURAL BACKGROUND

Mr. Brown was indicted for possession with intent to distribute approximately seven kilograms of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1). He filed a motion to suppress the contraband.

The district court denied Mr. Brown's motion. It first concluded the deputies had reasonable suspicion to stop Mr. Brown for a violation of Kan. Stat. Ann. ("K.S.A.") § 8-1522(a), which requires that "vehicle[s] be driven as nearly as practical entirely within a single lane . . . ." The district court then found that Mr. Brown voluntarily consented to the roadside search and that, afterward, the entire roadside encounter was consensual. Alternatively, the court concluded that the roadside encounter, including the delay in waiting for the drug dog, was justified by reasonable suspicion of narcotics trafficking. It then found that Mr. Brown voluntarily consented to follow the deputies to the sheriff's office. Finally, the court concluded that Mr. Brown voluntarily consented to the second search of his vehicle at the sheriff's office.

Mr. Brown conditionally pleaded guilty and was sentenced to 70 months' imprisonment and three years' supervised release. He now seeks reversal of the district court's denial of his motion to suppress.

## II. STANDARD OF REVIEW

In reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's findings of fact unless clearly erroneous. *United States v. Patterson*, 472 F.3d 767, 775 (10th Cir. 2006). The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court. *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004). We review de novo, however, the ultimate question of reasonableness under the Fourth Amendment. *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004).

## III. DISCUSSION

On appeal, Mr. Brown first argues the officers initially stopped him without reasonable suspicion of a traffic violation. Second, he contends that his consent to search his vehicle at the sheriff's office was tainted by an unlawful arrest, which allegedly occurred when he was persuaded to go to the sheriff's office. *See United States v. Recalde*, 761 F.2d 1448, 1459 (10th Cir. 1985) (noting that a consent to search made following an illegal arrest must be considered inadmissible as tainted unless the government establishes the consent was purged of the taint). Specifically, he challenges the district court's finding that he voluntarily consented to go to the sheriff's office, arguing that, in actuality, the

officers placed him under de facto arrest absent probable cause.[2]  In response to

Mr. Brown's second challenge, the government argues the officers had probable

cause to arrest Mr. Brown for vehicle theft, irrespective of his consent.

We conclude the district court's denial of Mr. Brown's motion to suppress

is supported by the record and the applicable law.  First, we agree with the district

court that the officers had reasonable suspicion to initially stop Mr. Brown for a

traffic violation.  Second, we agree with the government's argument that the

officers had probable cause to arrest Mr. Brown for vehicle theft and thus to take

him to the sheriff's office.  *See United States v. Sandoval*, 29 F.3d 537, 542 n.6

---

[2]  We note that, in a footnote, Mr. Brown broadly asserts his "consent to search his car at the Sheriff's Office [was] not valid or voluntary."  Aplt's Br. at 14-15 n.2.  He does not, however, elaborate on this statement nor does he argue that the district court's finding that he voluntarily consented to the search at the sheriff's office constituted clear error.  Rather, his brief focuses only on the district court's finding that he voluntarily consented to go to the sheriff's office and the alleged absence of probable cause to arrest him during the roadside detention.  Mr. Brown also failed to raise this issue at oral argument.  Accordingly, this issue is waived.  *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir. 1990) (failure to argue issue in appellate brief or at oral argument constitutes waiver).

Even if Mr. Brown had argued this issue, the district court's finding that he voluntarily consented was not " without factual support in the record." *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000) (internal quotation marks omitted).  Indeed, the record suggests that the demeanor of the officers' was pleasant and not insisting.  Moreover, Deputy Dollison promptly returned Mr. Brown's paperwork after having contacted Enterprise and Mr. Brown was allowed to stay in the garage to smoke a cigarette.  Furthermore, he was not handcuffed, restrained, or confronted with weapons. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (reviewing voluntariness of consent to search, considering all factors) (collecting cases).  Thus, the district court's finding of voluntary consent was not clear error.

(10th Cir. 1994) ("We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.") (internal quotation marks omitted). Because we conclude the officers had probable cause to arrest, we need not address the district court's finding of voluntary consent. For purposes of our analysis, we therefore assume that Mr. Brown was arrested and taken to the sheriff's office.

## A. REASONABLE SUSPICION OF A TRAFFIC VIOLATION

Mr. Brown first challenges the validity of the deputies' initial stop of his vehicle. To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993). Thus, the constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted).

In this case, the district court concluded Deputy Dollison had reasonable suspicion to stop Mr. Brown for violating K.S.A. § 8-1522(a), which provides:

> [w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, . . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the

driver has first ascertained that such movement can be made with safety. Thus, as the Kansas Court of Appeals recently noted, "in articulating reasonable suspicion that a [violation of K.S.A. § 8-1522(a)] has occurred in order to justify the traffic stop, the totality of the circumstances must make it appear to the officer that not only did the defendant's vehicle move from its lane of travel, *but it left its lane when it was not safe to do so*." *State v. Ross*, 149 P.3d 876, 879 (Kan. Ct. App. 2007) (emphasis added).

Mr. Brown does not dispute that Deputy Dollison saw his vehicle move from its lane and onto the shoulder of the road three or more times. Instead, he relies on *Ross* and the plain language of the statute, *see* K.S.A. § 8-1522(a) ("*and shall not be moved from such lane until the driver has first ascertained that such movement can be made *with safety*"), and argues that the officers could not have reasonably suspected that he made an unsafe lane change.

We disagree. An officer's observation of a vehicle straying out of its lane multiple times over a short distance creates reasonable suspicion that the driver violated K.S.A. § 8-1522(a) so long as the strays could not be explained by "adverse physical conditions" such as the state of the road, the weather, or the conduct of law enforcement. *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999). *See, e.g.*, *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003); *United States v. Zabalza*, 346 F.3d 1255, 1258-59 (10th Cir. 2003). Implicit in these decisions is the notion that when a vehicle repeatedly crosses out

-13-

of its lane without apparent justification, an officer may reasonably suspect that the driver did not purposely move out of the lane and, thereby, failed to first ascertain that one or more of those departures could be "made with safety," in violation of K.S.A. § 8-1522(a).

Here, the record indicates that neither the road nor the weather nor the officers' conduct affected Mr. Brown's driving. Deputy Dollison specifically testified that (1) Mr. Brown crossed onto the shoulder on a flat and straight portion of I-70; (2) there were not any patches of water on the road that could have caused the repeated strays; and (3) the wind and rain did not impede Deputy Dollison's ability to maintain his vehicle's position within his lane. Moreover, there is no evidence that the officers' played any role in Mr. Brown's three lane departures. Thus, sufficient evidence existed for Deputy Dollison to reasonably suspect that Mr. Brown failed to first ascertain that at least one of his three movements across the fog line could be made with safety.

We further note that this case presents a very different factual scenario than that found in *Ross*. There, the Kansas Court of Appeals held that a single instance of a vehicle swerving onto the shoulder of the road did not create a reasonable suspicion that the driver made an unsafe lane change. In doing so, the court noted, among other things, that "[t]here was no testimony that [the detaining officer] was concerned that the driver might have been falling asleep or was intoxicated," the driver's "vehicle was not weaving back and forth on the

-14-

roadway," and the driver "was not using the paved shoulder as a regular lane of travel." *Ross*, 149 P.3d at 880. Here, unlike *Ross*, Deputy Dollison saw Mr. Brown's vehicle drift onto the shoulder at least *three* times and initiated the stop out of a concern that Mr. Brown was tired or intoxicated. To be sure, Deputy Dollison's observation of the three lane departures was, "at a minimum, . . . sufficient to create a reasonable suspicion that [Mr. Brown] might be sleepy or impaired, and could present a risk of harm to himself and others." *Zabalza*, 346 F.3d at 1258 (internal quotation marks omitted).

Based on the foregoing, the officers' initial stop of Mr. Brown comported with the Fourth Amendment.

### B. PROBABLE CAUSE TO ARREST

Mr. Brown next argues his consent to search at the sheriff's office was tainted by an unlawful arrest during the roadside encounter. As noted above, we assume for the sake of our analysis that the officers arrested Mr. Brown during the roadside encounter.

The validity of a warrantless arrest turns on whether the arresting officers had probable cause. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985). "Probable cause to arrest exists if, under the totality of the circumstances, the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer in believing the defendant is engaged in an illegal activity." *United States v. Stephenson*, 452 F.3d 1173, 1178

(10th Cir. 2006). Once probable cause to arrest for a particular offense exists, an arrest is justified irrespective of whether the arrestee actually committed the offense. *See Henry v. United States*, 361 U.S. 98, 102 (1959) ("If the officer acts with probable cause, he is protected even though it turns out that the citizen is innocent."). Accordingly, probable cause demands "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

In determining whether probable cause for arrest exists, our inquiry is objective. We "evaluate[] . . . the circumstances as they would have appeared to prudent, cautious, and trained police officers." *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999) (internal quotation marks omitted). The officers' own subjective opinions or beliefs about probable cause are not dispositive. *Id.* In addition, we are mindful that probable cause is a "commonsense, non-technical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *Gates*, 462 U.S. at 231).

The government contends the officers had probable cause to arrest Mr. Brown for vehicle theft under K.S.A. § 21-3701(a), which provides that a person commits theft if he obtains or exerts "unauthorized control over [another's] property" and has the "intent to deprive the owner permanently of possession, use

-16-

or benefit of the . . . property." K.S.A. § 21-3701(a)(1). Thus, under this statute, the officers had probable cause to arrest Mr. Brown if the facts and circumstances within their knowledge were sufficient to justify a prudent officer in believing that Mr. Brown was exerting unauthorized control over the rental vehicle and intended to permanently deprive Enterprise of it.

We think that sufficient facts existed to justify a prudent, cautious, and trained police officer in believing that Mr. Brown had committed vehicle theft under K.S.A. § 21-3701(a), even though subsequent investigation revealed that Mr. Brown lawfully possessed the car. As an initial matter, prior to encountering Mr. Brown, police dispatch informed the officers that a man "ran" out of a motel and drove east on I-70 after refusing to disclose information about a dark-colored Dodge Intrepid because he was afraid the motel was going to "call the cops." Aple's Supp. App. at 112. As Deputy Dollison testified, this information indicated that the man at the motel wanted to avoid contact with the police because, among other things, "[t]he vehicle might be stolen." *Id.* at 40. Importantly, the officers reasonably suspected that Mr. Brown was the man from the motel because he was driving east on I-70 in a car that matched the report's description. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("[P]olice observation of an individual fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes reasonable suspicion that the individual is the subject of

-17-

the dispatch.").

Similarly indicative of a crime was Mr. Brown's behavior during his initial conversation with Deputy Dollison. As the district court noted, Mr. Brown was extremely nervous with shaky hands, overly talkative, and driving in a tie at 3:45 a.m. even though he was purportedly in the floor-cleaning business. In addition, when Deputy Dollison asked him where he was coming from, Mr. Brown vaguely replied "out west." Aple's Supp. App. at 49. *See Ozbirn*, 189 F.3d at 1200 (noting that "suspicious conduct . . . , including nervous, talkative, and overly-friendly behavior, and vague description of . . . travel plans" contributed in conjunction with other factors to the probable cause calculus).

Standing alone, Mr. Brown's activity at the hotel and Deputy Dollison's initial observations would be insufficient to establish probable cause. However, the officers soon became aware of several additional facts that, combined with Mr. Brown's suspicious behavior, established "a probability or substantial chance," *Gates*, 462 U.S. at 243 n.13, that Mr. Brown had stolen the rental vehicle. *See generally Sibron v. New York*, 392 U.S. 40, 66-67 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.").

First, during his initial conversation with Mr. Brown, Deputy Dollison

-18-

discovered that Mr. Brown's rental agreement with Enterprise had apparently expired ten days earlier. This fact was highly suggestive of a vehicle theft, for the agreement indicated on its face that Mr. Brown may have been exerting unauthorized control over the vehicle for a substantial amount of time. *See State v. Greene*, 5 P.2d 933, 938 (Kan. Ct. App. 1981) ("[U]nauthorized control means control exercised over property of another without the consent of the owner.") (internal quotation marks omitted). *See generally Ramirez v. Ashcroft*, 361 F. Supp. 2d 650, 658 (S.D. Tex. 2005) ("Unauthorized use of a motor vehicle can encompass acts such as using a vehicle in a manner that exceeds the scope of the owner's consent."). Although Enterprise had not taken any affirmative steps to repossess the vehicle or to suggest it might be stolen, the fact that the vehicle was apparently ten days overdue suggested that Mr. Brown intended to permanently deprive Enterprise of possession. *See United States v. Edwards*, 576 F.2d 1152, 1155 (5th Cir. 1978) (noting that "exceeding the scope of the rental agreement would support a jury finding that [the defendant] intended to steal the car.").

Moreover, the fact that the officers did not telephone "1-800-Enterprise," as Mr. Brown requested, does not vitiate probable cause. As noted above, the officers did attempt to contact the company by calling a number listed on the rental agreement. Although that attempt was unsuccessful and Mr. Brown proposed another alternative, the officers were neither required to "investigate independently every claim of innocence," nor compelled "by the Constitution to

perform an error-free investigation of such a claim." *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979). *See also Romero v. Fay*, 45 F.3d 1472, 1480 (10th Cir. 1995) ("Given the requirement[] that arrest be made only on probable cause, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."); *Thompson v. City of Olson*, 798 F.2d 552, 556 (1st Cir. 1986) ("[H]aving once determined that there is probable cause to arrest, an officer should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car.").

Additionally, after Deputy Dollison returned to the vehicle and ran a check on Mr. Brown's license, dispatch informed the officers that Mr. Brown had falsely identified himself as "Hector Burgos." As a general matter, the use of an alias is suspicious because it suggests an individual's desire to avoid police detection. *United States v. Gordon*, 173 F.3d 761, 767 (10th Cir. 1999). Here, particularly in light of the report from dispatch and the expired rental agreement, Mr. Brown's use of an alias was probative of a vehicle theft because it suggested that he used it to rent the vehicle. *See* K.S.A. § 21-3702(a)(1) (stating the "[t]he giving of a false identification or fictitious name . . . at the time of obtaining control over [rented] property" constitutes "prima facie evidence of intent to

permanently deprive the owner . . . of property."). Although the rental contract is not in the record, the only indication that the defendant's identity was "Jason Brown" came from police dispatch, suggesting that the rental contract and driver's license each identified Mr. Brown as "Hector Burgos."

Finally, as Sergeant Schneider testified, the presence of multiple air fresheners and the gas can in the vehicle suggested that Mr. Brown was transporting narcotics in either the gas can itself or a hidden compartment in the vehicle's gas tank. *See* Aple's Supp. App. at 133-34. We think that the probability that Mr. Brown had stolen the vehicle was further increased by the presence of these items because individuals who transport narcotics or who are involved in the drug-trade often employ stolen vehicles. *See, e.g.*, *United States v. Sutherland*, 405 F.3d 263, 269 (5th Cir. 2005) (noting that defendant drove a "stolen [rental] car containing controlled substances and illegal drugs"); *United States v. Mathis*, 357 F.3d 1200, 1202-03 (10th Cir. 2004) ("[A] warrant was executed at defendant['s] residence authorizing a search for records and other evidence of his purported illegal activities, including distribution of methamphetamine and possession of stolen vehicles.").

We therefore conclude the combined weight of the report from dispatch, Mr. Brown's behavior during the initial stop, the expired rental agreement showing the vehicle was ten days overdue, Mr. Brown's use of an alias, and the evidence suggesting Mr. Brown was transporting narcotics in the vehicle was

sufficient to establish probable cause that Mr. Brown had committed vehicle theft under K.S.A. § 21-3701(a). Accordingly, Mr. Brown's arrest comported with the Fourth Amendment, and his subsequent consent at the sheriff's office to search his vehicle was valid.

### IV. CONCLUSION

For the reasons stated above, we AFFIRM the district court's denial of Mr. Brown's motion to suppress.