**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 13, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

JOHN MICHASE QUINN; LAVERN
GONZALEZ, individually and as next
friend to FABIAN CHAVEZ, a minor
child,

        Plaintiffs-Appellees,

v.

WILLIAM LEON YOUNG;
BENJAMIN MELENDREZ,

        Defendants-Appellants,

No. 13-2074

SGT LOUIS ARMIJO, a Supervisor;
JOHN OR JANE DOES, No. 1 and 2,
Supervisors; JOHN OR JANE DOE
No. 3, Spokesperson, Albuquerque
Police Department; NADINE
HAMBY; RAY SCHULTZ, Chief,
Albuquerque Police Department;
ALBUQUERQUE POLICE
DEPARTMENT; CITY OF
ALBUQUERQUE,

        Defendants.

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:12-CV-00005-MCA-ACT)**

Paul Cash, Assistant City Attorney, City of Albuquerque Legal Department, Albuquerque, New Mexico, for Defendants-Appellants.

Nicholas Sitterly, Twohig Law Firm, Albuquerque, New Mexico (Ray Twohig, Twohig Law Firm, Albuquerque, New Mexico, with him on the brief), for Plaintiffs-Appellees.

---

Before **HOLMES**, **MATHESON**, and **BACHARACH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

On July 30, 2010, Plaintiffs John Quinn and Lavern Gonzalez were arrested in connection with an Albuquerque Police Department ("APD") larceny sting. They subsequently filed a civil-rights lawsuit against the arresting officers, William Young and Benjamin Melendrez ("the Officers"), bringing claims of (1) warrantless arrest without probable cause in violation of the Fourth Amendment, (2) entrapment, (3) substantive due process, and (4) malicious prosecution.

The Officers moved for summary judgment based on qualified immunity, but the district court denied their motion. The district court concluded that a reasonable jury could have found that the Officers arrested Mr. Quinn and Ms. Gonzalez without probable cause. Additionally, the court determined that a reasonable law-enforcement official in the Officers' position would have known it was unlawful to make the challenged arrests without probable cause that Mr. Quinn and Ms. Gonzalez possessed the requisite mens rea for the crime of larceny

2

(i.e., specific intent to permanently deprive another of personal property). In this interlocutory appeal from the denial of qualified immunity, the Officers contend that the district court erred because they had probable cause to arrest Plaintiffs and, alternatively, because the law did not clearly establish that their actions during the sting violated the Fourth Amendment.

We agree with the Officers that the extant clearly established law would not have put a reasonable, similarly situated officer on notice that his conduct (here, arresting Mr. Quinn and Ms. Gonzalez in this sting operation) was unlawful. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **reverse** the district court's summary-judgment decision denying qualified immunity to the Officers on Plaintiffs' Fourth Amendment claim and direct the court to enter judgment in favor of the Officers on that claim (i.e., grant the Officers qualified immunity). For the reasons stated below, we also **dismiss** Plaintiffs' entrapment claim. Lastly, we **remand** the case to the district court with instructions to explicitly set forth its reasoning as to whether the Officers may avail themselves of qualified immunity on Plaintiffs' malicious-prosecution and substantive due process claims and to rule on those claims anew.

**I**

In the summer of 2010, Sergeant Louis Armijo was in charge of the APD Valley Area Command, which responded to pressing criminal issues in downtown Albuquerque. Reports of frequent larcenies prompted Sergeant Armijo to develop

3

an undercover tactical operations plan (the "Tact Plan") for his squad. The Tact Plan involved various stings wherein members of Sergeant Armijo's team would plant different items, such as alcohol and cigarettes, in public locations as enticements for potential thieves.

One such sting took place on July 30, 2010. The Officers, clad in plainclothes, were assigned to that particular operation and were directed to plant a backpack containing cigarettes, beer, and a laptop computer in a "public predetermined location" downtown. Aplt. App. at 11 (Compl., filed Jan. 3, 2012). Consistent with these instructions, the Officers placed the backpack near an automated teller machine ("ATM") and then watched from a distance to see if anyone absconded with the backpack.

During their surveillance, the Officers noticed a man, a woman, and a school-aged boy (i.e., Plaintiffs) approaching the backpack. The Officers watched as the two adults spoke to the child, later identified as Fabian Chavez, who then picked up the backpack. At that point, apparently without attempting to discover the backpack's true owner, the trio left the vicinity and walked to a local diner. The Officers followed Plaintiffs to the diner, sat down close by, and watched Mr. Quinn place an order for a hamburger. Meanwhile, Officer Young contacted the APD dispatch and verified that no one had recently called police headquarters to report having found an abandoned backpack.

4

While seated in the diner, the Officers saw Ms. Gonzalez examine the backpack's contents and remove the laptop. Ms. Gonzalez proceeded to open the laptop, which displayed an APD icon on the screen as it entered startup mode. At that point, the Officers confronted Plaintiffs, arrested Mr. Quinn and Ms. Gonzalez (without a warrant) on charges of larceny, and transported them to Albuquerque's Metropolitan Detention Center.[1] Mr. Quinn and Ms. Gonzalez remained in custody for approximately two days. In early August of 2010, the charges against them were dismissed.

On January 3, 2012, Plaintiffs filed a complaint in the United States District Court for the District of New Mexico, naming as defendants the Officers, Sergeant Armijo, APD Chief Ray Schultz, the APD, four APD "supervisors" and "spokespersons," and the City of Albuquerque (collectively "Defendants"). Pursuant to 42 U.S.C. § 1983, Plaintiffs alleged that Defendants' conduct, as well as the Tact Plan itself, violated their Fourth Amendment right to be free from unlawful seizure. Plaintiffs also sought relief on the grounds that Defendants had (1) committed "the constitutional parallel to common law malicious prosecution,"

---

[1] Post-arrest details concerning the minor accompanying Mr. Quinn and Ms. Gonzalez—Mr. Chavez—are not entirely clear from the record presented to us. It suffices to say, however, that Plaintiffs' averments are limited to the "humiliation" and "trauma" Mr. Chavez allegedly suffered "because of the publicity engendered by the [APD]" after the incident. Aplt. App. at 15.

5

Aplt. App. at 16; (2) entrapped them in the sting;[2] and (3) violated their substantive due process rights by causing them "public embarrassment and humiliation and damage to their reputation[s]," *id.* at 15. Defendants then sought summary judgment, arguing that (1) the named individuals (notably, the Officers) were entitled to qualified immunity on all claims brought against them; (2) Plaintiffs had stated no constitutional violation by any municipal employee (and, by extension, no cognizable municipal-liability claim); and (3) Plaintiffs had stated no actionable constitutional claim against Chief Schultz or any APD supervisor.

The district court granted Defendants' motion in part and denied it in part. As relevant here, the court generally purported to deny summary judgment to the Officers on all of Plaintiffs' claims. In so doing, the district court determined that Plaintiffs had established a genuine issue of material fact as to whether there was probable cause to arrest. The court then concluded that because "well-settled constitutional and state-law precedent would have put a reasonable officer on

---

[2] As discussed further *infra*, on the face of the complaint, Plaintiffs' vague, scattered entrapment allegations pertained *only* to the APD and the City of Albuquerque (collectively "Governmental Defendants"). *See* Aplt. App. at 10 (describing APD's policy as one designed "to entrap innocent citizens" and mentioning the City's "public policy of arresting innocent people"). Indeed, as we discuss *infra* in Part II.C.1, in light of our determination that Plaintiffs at no point fairly presented their entrapment claim to the district court as one involving the Officers, we conclude that we lack jurisdiction to address the district court's ruling regarding this claim as part of the Officers' interlocutory appeal and, therefore, dismiss that portion of the appeal.

6

notice that he could not lawfully arrest for larceny unless he had probable cause to believe the suspect intended to permanently deprive the owner of his property," the Officers were not entitled to qualified immunity on Plaintiffs' Fourth Amendment claim. *Id.* at 150 (Mem. Op. & Order, filed Mar. 22, 2013). Finally, though ruling against them, the court did not expressly articulate *why* the Officers could not avail themselves of the qualified-immunity defense against Plaintiffs' malicious-prosecution and substantive due process claims, nor did the court articulate its basis for ruling on the entrapment claim.

The Officers have timely appealed from the district court's ruling.

## II

### A

Primarily at issue on appeal is whether the district court erred in denying qualified immunity to the Officers on Plaintiffs' Fourth Amendment claim. Plaintiffs insist that this denial was proper because, in their view, the Officers effected the challenged, warrantless arrests without probable cause to believe Plaintiffs had committed larceny. We begin our review by setting forth the legal standards applicable to this matter: those governing (1) qualified immunity, (2) probable cause, and (3) larceny under New Mexico law.

### 1

"We review the district court's denial of summary judgment on qualified immunity grounds de novo, with our review limited to purely legal issues."

*Aldaba v. Pickens*, --- F.3d ----, 2015 WL 451227, at *3 (10th Cir. 2015).

Because the doctrine of qualified immunity "not only protects public employees from liability, [but] also protects them from the burdens of litigation," *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013), "we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions," *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1108 (10th Cir. 2008) (internal quotation marks omitted); *see also id.* at 1111 (explaining that our review is of "an interlocutory appeal from the denial of qualified immunity at the summary judgment stage of litigation").

More specifically, when this defense is raised, the onus is on the plaintiff to demonstrate "(1) that the official violated a statutory or constitutional right, *and* (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, --- U.S. ----, 131 S. Ct. 2074, 2080 (2011) (emphasis added); *accord Stewart v. Beach*, 701 F.3d 1322, 1329–30 (10th Cir. 2012). The plaintiff must make this demonstration "on the facts alleged." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). And, because we are past the pleading phase at summary judgment, the plaintiff's factual recitation must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) ("As with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, . . . a court should

8

not adopt that version of the facts[.]'" (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))).  However, we construe the facts in the light most favorable to the plaintiff as the non-movant.  *See Scott*, 550 U.S. at 378.

We may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *accord Green v. Post*, 574 F.3d 1294, 1299 (10th Cir. 2009).  In order "[f]or a constitutional right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir.) (second alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), *cert. denied*, --- U.S. ----, 134 S. Ct. 426 (2013); *accord Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013).

A plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, "the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (internal quotation marks omitted); *accord Felders v. Malcom*, 755 F.3d 870, 884 (10th Cir. 2014), *cert. denied*, --- U.S. ----, 135 S. Ct. 975 (2015); *cf. Lane v. Franks*, --- U.S. ----, 134 S. Ct. 2369, 2383 (2014) (noting that "a discrepancy in . . . Circuit precedent . . . is insufficient to defeat the defense of qualified

immunity"). However, the plaintiff need not locate a *perfectly* on-point case. *See Weise*, 593 F.3d at 1167 (centering the inquiry on whether, "in the light of pre-existing law," the unlawfulness of the defendant's conduct was "apparent" (quoting *Anderson*, 483 U.S. at 640) (internal quotation marks omitted)). In fact, "[t]he Supreme Court has explained that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Nevertheless, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 131 S. Ct. at 2084 (citation omitted); *see Tolan v. Cotton*, --- U.S. ----, 134 S. Ct. 1861, 1866 (2014) ("[W]e have instructed that courts should define the clearly established right at issue on the basis of the specific context of the case." (internal quotation marks omitted)). Particularly apropos to this case is the Court's admonition that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S. Ct. at 2084; *see also Wilson v. Layne*, 526 U.S. 603, 615–16 (1999) ("[I]t is not obvious from the general principles of the Fourth Amendment that the conduct of the officers *in this case* violated the Amendment." (emphasis added)); *Anderson*, 483 U.S. at 640 (noting, with disapproval, that "[t]he Court of Appeals' brief

10

discussion of qualified immunity consisted of little more than an assertion that a general right [the officer] was alleged to have violated . . . was clearly established"). In sum, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083; *accord Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). We must scrupulously adhere to our longstanding duty to ascertain "clear law (clear answers) that would apply to the situation at hand." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)) (internal quotation marks omitted).

**2**

In the instant case, Plaintiffs contend that, while acting under color of state law, the Officers violated their Fourth Amendment right to be free from improper arrest. An arrest is "characterized by a highly intrusive or lengthy search or detention," *United States v. Villagrana-Flores*, 467 F.3d 1269, 1273 (10th Cir. 2006) (internal quotation marks omitted), and it is well-settled that "[l]aw enforcement officers may find it wise to seek arrest warrants where practicable to do so," *United States v. Pearson*, 203 F.3d 1243, 1269 (10th Cir. 2000) (internal quotation marks omitted). But a warrantless arrest may nonetheless comport with the Fourth Amendment "where there is probable cause to believe that a criminal offense has been or is being committed." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008) (internal quotation marks omitted). Consequently, in

11

a § 1983 action based on a warrantless arrest, the defendant may be entitled to qualified immunity if he had probable cause to arrest the plaintiff. *See Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007). The Supreme Court has afforded law-enforcement officials a wide berth in this regard. *See Virginia v. Moore*, 553 U.S. 164, 171 (2008) ("[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence, the . . . arrest is constitutionally reasonable."); *accord Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

We assess probable cause under an objective standard of reasonableness. *See Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir.), *cert. denied*, --- U.S. ----, 135 S. Ct. 881 (2014); *United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1209 (10th Cir. 2007). As a result, "an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime." *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008); *accord United States v. Chavez*, 660 F.3d 1215, 1225 (10th Cir. 2011). Relying on the Supreme Court's holding in *Devenpeck v. Alford*, 543 U.S. 146 (2004), we have stated that "[a]n arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as 'the circumstances, viewed objectively, justify' the arrest." *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006) (quoting *Devenpeck*, 543 U.S. at 153).

12

Even so, a finding of probable cause requires "more than a bare suspicion." *Storey v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012) (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)) (internal quotation marks omitted). Thus, "[w]here an officer observes inherently innocuous behavior that has plausible innocent explanations, it takes more than speculation or mere possibility to give rise to probable cause to arrest." *Sherouse v. Ratchner*, 573 F.3d 1055, 1062 (10th Cir. 2009); *cf. United States v. Welker*, 689 F.2d 167, 169 (10th Cir. 1982) (noting "a multitude of innocent explanations" for the arrestee's behavior that, in the light of the entire record, "[did] not add up to probable cause to arrest").

**3**

Plaintiffs allege that the Officers lacked probable cause to arrest Mr. Quinn and Ms. Gonzalez for committing larceny under New Mexico law. New Mexico defines larceny as "the stealing of anything of value that belongs to another." N.M. Stat. Ann. § 30-16-1(A); *see State v. Shroyer*, 160 P.2d 444, 450 (N.M. 1945) ("It is obvious that the charge of 'larceny' implie[s] the theft of the property of another."). The term "'anything of value' means any conceivable thing of the slightest value, tangible or intangible, movable or immovable, corporeal or incorporeal, public or private." N.M. Stat. Ann. § 30-1-12(F).

Although New Mexico's larceny statute is silent on the requisite state of mind that gives rise to the offense, the state's common law demonstrates that "[l]arceny includes the concept of criminal intent . . . [i.e.,] an intention to

13

permanently deprive the owner of possession of his property." *State v. Austin*, 461 P.2d 230, 233 (N.M. Ct. App. 1969) (citation omitted); *see State v. Powell*, 848 P.2d 1115, 1117 (N.M. Ct. App. 1993) ("The mental state required in larceny-type offenses [is] intent to take, coupled with knowledge of the facts making the taking unlawful . . . ."); *see also Rules of State Court*, N.M.R.A., Crim. Uniform Jury Instruction No. 14-1601 (noting that to convict, the jury must find beyond a reasonable doubt that "[t]he defendant took and carried away [property] belonging to another" and that "[a]t the time he took this property, the defendant intended to permanently deprive the owner of it" (footnotes omitted)); *cf. State v. Rhea*, 523 P.2d 26, 27 (N.M. Ct. App. 1974) ("'Stealing' implies a taking without consent."). By contrast, "abandoned property does not belong to anyone and may legally be appropriated by the first taker." *State v. Muqqddin*, 242 P.3d 412, 416 (N.M. Ct. App. 2010), *rev'd on other grounds sub nom. State v. Office of Pub. Defender ex rel. Muqqddin*, 285 P.3d 622 (N.M. 2012).

**B**

**1**

Framed in the light of these standards, the salient Fourth Amendment questions presented are (1) whether the Officers possessed probable cause to arrest Mr. Quinn and Ms. Gonzalez for committing larceny in this sting operation; and (2) whether extant clearly established law in July of 2010 would have placed a reasonable, similarly situated police officer on notice that *no* probable cause

14

existed for the warrantless arrests in this sting operation—more specifically, that no probable cause existed that Mr. Quinn and Ms. Gonzalez intended to permanently deprive another of property. As our qualified-immunity jurisprudence permits us to do, we exercise our discretion to proceed straight to the latter question and resolve this claim on the clearly-established-law prong of our qualified-immunity test. *See Tolan*, 134 S. Ct. at 1866; *Green*, 574 F.3d at 1299. That is, without deciding whether the Officers violated Plaintiffs' Fourth Amendment rights by effecting the arrests at issue, we conclude that any constitutional violation would not have been apparent based on the clearly established law existing at that time. It follows ineluctably that the Officers are entitled to qualified immunity on Plaintiffs' Fourth Amendment claim.

Our qualified-immunity conclusion is predicated upon the specific factual context of the Officers' conduct—a larceny sting operation—which presents a set of "circumstance[s] unique in itself" under extant clearly established law. *Eidson v. Owens*, 515 F.3d 1139, 1148 (10th Cir. 2008). As we detail below, Plaintiffs have not directed us to any clearly established law involving such sting operations or an analogous law-enforcement setting, nor did the district court rely on any such law. This caselaw void is significant and ultimately determinative because we cannot confidently conclude that a reasonable officer engaged in a sting operation, such as the one here, would have had fair warning based on the holdings of non-sting cases regarding the quantum and quality of proof necessary

15

to establish probable cause for a larceny offense, especially with respect to a suspect's specific intent—that is, the intent to permanently deprive another of property.

We are not alone among the circuit courts in recognizing that sting operations present unique questions relating to suspect culpability, particularly regarding the question of intent. *See, e.g.*, *United States v. Yuman-Hernandez*, 712 F.3d 471, 474 (9th Cir.) (noting that "[t]he ease with which the government can manipulate" factors, including intent, in sting operations, causes courts to be "wary of such operations in general" (quoting *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010)) (internal quotation marks omitted)), *cert. denied*, --- U.S. ----, 134 S. Ct. 261 (2013); *cf. United States v. Black*, 733 F.3d 294, 298, 303 (9th Cir. 2013) (noting "troubling aspects" of a reverse sting designed "to find and arrest crews engaging in violent robberies of drug stash houses," including "[t]he risk inherent in targeting . . . a generalized population," specifically, "creat[ing] a criminal enterprise that would not have come into being but for the temptation of a big payday, a work of fiction spun out by government agents to persons vulnerable to such a ploy who would *not otherwise have thought of doing such a robbery*" (emphasis added)), *cert. denied*, --- U.S. ----, 135 S. Ct. 267 (2014).

Several commentators have likewise highlighted similar concerns engendered by sting operations. *See, e.g.*, Josh Marquis, *Prosecutors and the*

16

*Media: It's Better Than You Think*, 43 Prosecutor 21, 21 (2009) (noting that, when "law enforcement was left with sting operations," "[p]roving specific intent was often difficult"); *see also* Richard H. McAdams, *The Political Economy of Entrapment*, 96 J. Crim. L. & Criminology 107, 111 (2005) ("Sting operations involve the government deceiving citizens for the purpose of encouraging them to commit crime."); Andrew Carlon, Note, *Entrapment, Punishment, and the Sadistic State*, 93 Va. L. Rev. 1081, 1124 (2007) ("[D]on't all sting operations necessarily 'create' crimes? Certainly some undercover operations involve police officers or informants infiltrating transactions or operations that would have transpired whether the police agent was there or not—these situations are simply a more active form of surveillance. A true sting, however, involves more than that—it entails, at a minimum, the undercover operative's active creation of an opportunity for crime."); *cf.* Bruce Hay, *Sting Operations, Undercover Agents, and Entrapment*, 70 Mo. L. Rev. 387, 406 (2005) ("[T]aking the bait is a 'positive,' that is, a possible signal that the target is a criminal. A true positive occurs when the bait is taken by a criminal; a false positive occurs when the bait is taken by a non-criminal. . . . The signaling value of different stings can vary enormously. . . . [Some] stings generate much weaker signals.").

Notably, in a larceny sting operation like this one, because law-enforcement officers have largely manufactured the setting for the crime, they possess considerable knowledge regarding the origin and ownership of the

17

property at issue. *See* Hay, *supra*, at 388 ("The defining feature of a sting operation is that through covert means, the authorities create or facilitate the very offense of which the defendant is convicted."). In particular, the officer arranging a larceny sting knows the identity of the true owner of the item (e.g., here, the Officers were obviously aware that the backpack belonged to the APD) well before that item entices potential thieves. As a result, it is clear to officers at the inception of the sting that when someone eventually appropriates the property used as "bait," the individual has done so with knowledge that he is not the property's true owner.

It seems patent that officers do not typically possess such prior knowledge in the general larceny context, where individuals unlawfully appropriate property of others. Generally, in New Mexico, the theft-crime inquiry centers around whether it can be shown "that [the perpetrator] took the [item] without the owner's consent . . . with the requisite criminal intent." *State v. Tovar*, 651 P.2d 1299, 1301 (N.M. 1982). And, in that inquiry, one unknown variable at the outset—which law enforcement (and, as applicable, the court) must determine—is the origin and ownership of the property at issue. *See id.* at 1301–02 (determining whether the evidence supported the inference that the perpetrator "took the [item] from [the owner]," and tacitly placing at issue the identity of the owner in the first instance); *see also State v. Buchanan*, 412 P.2d 565, 567 (N.M. 1966) (explaining that "[t]he corpus delicti of larceny is constituted of two

18

elements: that the property was lost by the owner, and that it was lost by a felonious taking," and then exploring the available information regarding the ownership of the item at issue).

Absent the support of clearly established law, we are unwilling to conclude that officers possessing the additional measure of knowledge stemming from a larceny sting operation would evaluate the existence *vel non* of probable cause in the same manner as officers in the typical larceny setting—especially with respect to the key element of a suspect's specific intent. Accordingly, we are dubious about the quality of the guidance, for purposes of our clearly-established-law analysis, that we might gain from non-sting authorities regarding the probable-cause question presented by these facts. Ultimately, having carefully reviewed the specific non-sting authorities that Plaintiffs identify here, and upon which the district court relied, we determine that the Officers would not have had fair warning that their arrests of Mr. Quinn and Ms. Gonzalez were lacking in probable cause, including regarding the intent element. In other words, in the context of the Tact Plan's backpack sting operation, we conclude that no constitutional violation would have been apparent to the Officers based on the extant clearly established law.

As explained below, the district court's clearly-established-law analysis was conducted at too high a level of generality—both with respect to our caselaw and with respect to New Mexico law. And Plaintiffs' attempt to bolster the

district court's analysis through further authorities is unavailing. In sum, because the district court did not rely upon, and Plaintiffs have not identified, any extant clearly established law that would have given the Officers fair warning that they lacked probable cause to effect arrests of Mr. Quinn and Ms. Gonzalez in their larceny sting operation, we conclude that the Officers are entitled to qualified immunity and the district court erred in finding to the contrary.

**2**

We first address the district court's overbroad analysis of the Officers' conduct in the context of qualified immunity. On that score, we have said that "[t]he Fourth Amendment's general prohibition against unreasonable seizures is cast at too high a level of generality to clearly establish the law." *Weigel v. Broad*, 544 F.3d 1143, 1170 (10th Cir. 2008) (internal quotation marks omitted). Consequently, to demonstrate that qualified immunity is not appropriate, a plaintiff may not simply allege—and the district court likewise may not accept as sufficient—the defendant's violation of an amorphously-defined Fourth Amendment right. We have required the showing of "a *substantial correspondence* between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Trotter v. Regents of Univ. of N.M.*, 219 F.3d 1179, 1184 (10th Cir. 2000) (emphasis added) (quoting *Hannula v. City of Lakewood*, 907 F.2d 129, 131 (10th Cir. 1990)) (internal quotation marks omitted).

20

In denying the Officers' motion for summary judgment, the district court cited two cases as the clearly established law applicable to Plaintiffs' Fourth Amendment claim: (1) our holding in *Keylon v. City of Albuquerque*, 535 F.3d 1210 (10th Cir. 2008), and (2) the New Mexico Supreme Court's holding in *State v. Miller*, 412 P.2d 240 (N.M. 1966). We cannot say that either case would have alerted a reasonable APD officer that the warrantless arrests of Mr. Quinn and Ms. Gonzalez in this backpack sting were unconstitutional.

*Keylon*, standing alone, cannot serve as the governing clearly established law because it merely involves the application of hornbook Fourth Amendment principles to an unrelated factual context. In that case, the plaintiff was arrested "for concealing her identity" after telling law enforcement that she did not know her son's birthday or address, and that she would "get [her] ID when [she was] ready." *Keylon*, 535 F.3d at 1213 (internal quotation marks omitted). The arresting officer justified his conduct by citing a New Mexico statute that criminalized "[r]esisting, evading or obstructing" law enforcement—the asserted predicate crime for the offense of concealing one's identity. *Id.* at 1216 (quoting N.M. Stat. Ann. § 30-22-1) (internal quotation marks omitted). We noted that although the referenced statute generally contemplates physical resistance, it also criminalizes "fighting words," i.e., "those which tend to incite an immediate breach of the peace." *Id.* at 1217 (internal quotation marks omitted). We then determined that the plaintiff's statements were not "fighting words" under the

21

operative statute, which only "prohibit[s] certain speech[ ] when that speech is abusive, but not when it is merely evasive." *Id.* Because the plaintiff had not physically resisted the officers or uttered any "fighting words," we concluded that "no reasonable person in [the arresting officer's] position could have thought he had probable cause to arrest." *Id.* at 1220.

When discussing clearly established law pertaining to the APD's sting operation, the district court relied upon our statement in *Keylon* that "[i]n the context of an unlawful arrest, [the] analysis is simple, for the law was and is unambiguous; a governmental official must have probable cause to arrest an individual." Aplt. App. at 149 (second alteration in original) (quoting *Keylon*, 535 F.3d at 1220) (internal quotation marks omitted). This statement from *Keylon*, while undoubtedly correct, does not demonstrate that the district court engaged in the proper clearly-established-law analysis. Indeed, the Supreme Court has made clear that reciting the overarching requirement of probable cause does not pass muster in a qualified-immunity clearly-established-law assessment. *See Anderson*, 483 U.S. at 640 n.2 (noting that if that were the case, "[a] passably clever plaintiff would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated").

At bottom, by relying upon *Keylon* in such a general sense, the district court committed error. *See al-Kidd*, 131 S. Ct. at 2084 (noting the Supreme Court's "repeated[ ]" instruction "not to define clearly established law at a high

22

level of generality"); *accord Panagoulakos*, 741 F.3d at 1130. *Keylon* provides negligible support for the proposition that the law was clearly established that arresting Mr. Quinn and Ms. Gonzalez in this backpack sting operation would violate their Fourth Amendment rights to be free from unlawful seizure.

After citing to *Keylon*, the district court turned to New Mexico law and invoked *Miller* for the view that "any reasonable officer would have recognized that Plaintiffs could not be guilty of larceny under settled New Mexico law unless, at the time they carried away the backpack, [they] had the specific intent to permanently deprive the owner of the backpack of his property." Aplt. App. at 150. The court stated, "Indeed, the New Mexico Supreme Court, relying on federal[3] case law, ha[s] squarely held that the Fourth Amendment requires probable cause as to the applicable *mens rea* to make a valid arrest for a specific intent crime." *Id.* In particular, the district court referred to the following language from *Miller* as dispositive: "[W]hen specific intent is an element of the crime charged, the complaint *seeking an arrest warrant* must indicate facts which

---

[3]    The specific federal citation in *Miller* was to *Pugach v. Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961), and it did not involve a direct quotation. *See Miller*, 412 P.2d at 243. However, it seems that the New Mexico Supreme Court cited to *Pugach* for the proposition that an arrest warrant may only issue upon a showing of probable cause. *See Pugach*, 193 F. Supp. at 637 ("The warrant cannot be issued unless the complaint shows probable cause that a crime has been committed and that the defendant has committed it."). This is neither binding precedent nor a sign that the "weight of authority from other courts," *Felders*, 755 F.3d at 884 (internal quotation marks omitted), favors Plaintiffs' view of the law.

23

show probable cause to believe the required intent was present." *Id.* (emphasis added) (quoting *Miller*, 412 P.2d at 243) (internal quotation marks omitted).

As the district court's reference to *Miller* suggests, that case involved an arrest (for murder) made pursuant to a warrant. The appellant specifically argued that his "arrest . . . was illegal because it was made upon a warrant which had been issued on a complaint which was insufficient" for lack of probable cause. *Miller*, 412 P.2d at 241. As pertinent here, the rule that a reasonable APD officer would take away from *Miller* would be a narrow one: that is, he cannot secure "an arrest warrant on [a] conclusory statement alone," or likewise lawfully procure a warrant by imparting such a conclusory statement to another officer. *Id.* at 243.

*Miller* is not clearly established law for this case because it does not indicate how an officer should tailor his conduct when making *warrantless* arrests in a larceny sting operation like this one. More specifically, *Miller* would not have provided appreciable guidance to the Officers here on how to assess, in the context of their backpack sting operation, whether they possessed sufficient evidence of culpable intent to effect the arrests of Mr. Quinn and Ms. Gonzalez.

Our analysis in *Lynch v. Barrett*, 703 F.3d 1153 (10th Cir. 2013), substantiates our view that the district court analyzed the applicable clearly established law at too high a level of generality. In resolving *Lynch*'s clearly-established-law question as to whether officers "violated [the plaintiff's] constitutional right to court access by refusing to disclose who exercised

24

excessive force" during a take-down, 703 F.3d at 1155, we rejected the plaintiff's invocation of a vague right to access the courts.

We explained:

> [S]imply to say the Constitution recognizes a right to court access casts too high a level of generality over our inquiry. To show *his* alleged right to court access was clearly established in the proper sense, Plaintiff should identify "cases of controlling authority . . . at the time of the incident . . . [or] a consensus of cases of persuasive authority" clearly establishing *the scope of the right encompasses the facts presented*, "such that a reasonable officer could not have believed that his actions were [consistent with that right]."

*Id.* at 1161 (second and third alterations in original) (omissions in original) (second emphasis added) (quoting *Layne*, 526 U.S. at 617). *Lynch*'s sound reasoning supports our conclusion that neither of the two authorities that the district court referenced clearly establishes the law governing the circumstances here. *See id.* at 1161–62; *see also Brosseau*, 543 U.S. at 198 ("It is important to emphasize that [the clearly-established-law] inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks omitted)); *Thomas v. Durastanti*, 607 F.3d 655, 669–70 (10th Cir. 2010) (rejecting as insufficiently particularized two proffered cases that pertained to the same general constitutional right, but otherwise involved wholly different risks and concerns).

We are especially comfortable rejecting the district court's clearly-established-law analysis as overbroad because, notably, it is at odds with another

25

ruling issued almost three years *after* the arrests at issue here by the United States

District Court for the District of New Mexico on similar facts: *Sanchez v.*

*Melendrez*, 934 F. Supp. 2d 1325 (D.N.M. 2013). *Sanchez* involved the very

same Tact Plan: APD officers placed a backpack containing cigarettes, beer, and a

laptop by an ATM located near a high school. *See* 934 F. Supp. 2d at 1329. The

plaintiff was arrested after opening the backpack, depositing it in his vehicle, and

preparing to drive away. In a thorough, well-reasoned opinion, the *Sanchez*

district court disparaged the Tact Plan and held that the officers lacked probable

cause to arrest the plaintiff. *See id.* at 1337–38 ("[Defendants] placed a

backpack that a reasonable person would believe to be abandoned next to an

ATM . . . . The fact that [the plaintiff] did not . . . drop what he was doing to find

the backpack's owner that instant[] in no way suggests that he intended to steal

it.").

But, importantly, the court also concluded that there was simply no extant

clearly established law that would have given the officers fair warning that their

conduct was unconstitutional. *See id.* at 1336. To that end, the *Sanchez* court

explained:

> The catch with a case such as this one is that it is often difficult,
> and sometimes impossible, to find a case whose facts even
> remotely resemble those in any given § 1983 case. Neither party
> has cited, nor can the Court find, clearly established law
> addressing the question of a sting operation comparable to the
> one at issue in the instant case. Nor has either party
> convincingly analogized these facts to any case that could even

26

> be said to arguably place the officers on notice that their actions were unconstitutional.

*Id.* The reasoning of *Sanchez* is cogent, and we believe that it highlights the correctness of our decision to reject the district court's approach in the instant case.[4]

Accordingly, for the reasons stated herein, we must reject the district court's generalized clearly-established-law analysis. Putting a finer point on the matter, we cannot agree with the district court's conclusion that *Keylon* or *Miller* could "be said to arguably place the [O]fficers on notice that their actions were

---

[4] A recent unpublished opinion from the Eleventh Circuit further confirms our view that the Officers had no guidance concerning the propriety of the challenged arrests from extant clearly established law. In *Jackson v. Capraun*, 534 F. App'x 854 (11th Cir. 2013) (per curiam), a panel of the Eleventh Circuit confronted a strikingly similar sting operation and awarded qualified immunity to the officers. The sting in *Jackson*, designed to catch bicycle thieves, was simple: the officers placed a bicycle in the street and then arrested the man who subsequently rode away on the bicycle. Critically, in awarding qualified immunity, the panel relied upon the fact that "there is no clearly established law that indicates that a bicycle theft sting, like the one used by these officers, is a violation of constitutional rights." *Id.* at 856.

While neither *Jackson* nor *Sanchez* binds us, these cases nonetheless have the capacity to inform our view regarding the state of the law. Specifically, that a panel of the Eleventh Circuit, and a district court within this circuit, determined in 2013 that there was no instructive caselaw regarding probable cause in a sting operation tends to give us a measure of assurance concerning the correctness of our view that in July 2010—the relevant temporal touchstone here—there was no clearly established law that would have given the Officers fair warning that their sting-operation arrests were unconstitutional.

27

unconstitutional," *Sanchez*, 934 F. Supp. 2d at 1336, when they arrested Mr. Quinn and Ms. Gonzalez in this larceny sting operation.

**3**

Plaintiffs nevertheless insist that the weight of clearly established law would have given the Officers fair notice that their conduct was constitutionally proscribed. And, in this regard, Plaintiffs attempt to bolster the district court's approach by reference to additional authorities. Plaintiffs seem to tacitly recognize our well-settled rule that "[t]he *plaintiff* bears the burden of citing to us what he thinks constitutes clearly established law." *Thomas*, 607 F.3d at 669 (emphasis added); *accord Albright v. Rodriguez*, 51 F.3d 1531, 1534–35 (10th Cir. 1995). Alas, Plaintiffs' authorities do not support their position. In the end, because we conclude that Plaintiffs have failed to identify clearly established law governing probable cause to arrest for larceny in a sting operation like this one (or an analogous law-enforcement setting), we remain convinced that the Officers are entitled to qualified immunity.

**a**

Before we assess Plaintiffs' proffered cases, however, we address their argument that undertaking a generalized caselaw analysis is "acceptable and necessary" and that "[t]his principle of necessary or essential generality is enshrined" in Tenth Circuit jurisprudence. Aplee. Br. at 14. Notably, in support of their position, Plaintiffs rely on *Lawmaster v. Ward*, 125 F.3d 1341 (10th Cir.

1997).  But, in our view, Plaintiffs attempt to stretch *Lawmaster* well beyond its scope.  *Lawmaster* addressed whether "leaving a gun submerged in a water bowl, and leaving ashes in bedding was reasonably necessary" conduct in effecting a residential search.  125 F.3d at 1351.  There, we recognized that there were "no decisions expressly prohibiting officers from" engaging in such conduct.  *Id.* Nevertheless, we concluded that there was sufficient clearly established law pertaining to the Fourth Amendment protections afforded citizens in residential searches to determine that the law-enforcement conduct was unconstitutional; accordingly, we denied the officers qualified immunity.  *See id.*

As we read it, as relevant here, *Lawmaster* simply stands for the proposition that, in conducting a clearly-established-law analysis, courts should not insist on a "precise factual correspondence" between the extant governing law and the circumstances of the alleged constitutional violation.  *Id.* (quoting *Garcia v. Miera*, 817 F.2d 650, 657 (10th Cir. 1987)) (internal quotation marks omitted). This rule of law lends Plaintiffs no succor.  Even putting aside the truth that there are no cases in the extant clearly established law that precisely correspond to the facts of the instant case—involving a larceny sting operation—Plaintiffs cannot overcome the fact that there are no cases within the relevant temporal period that even slightly resemble these facts.  And we know from our precedent that the correspondence must be "substantial."  *See, e.g.*, *Trotter*, 219 F.3d at 1184 (internal quotation marks omitted).  Therefore, Plaintiffs' reliance on *Lawmaster*

29

as support for a generalized clearly-established-law analysis—of the type the district court undertook here—is unavailing.

Plaintiffs also place unwarranted and misguided reliance on our holding in *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012), which they describe as "[o]ne recent 10th [C]ircuit case [which] found clearly established law while requiring no more specificity than the broad principle of the probable cause requirement for a warrantless arrest." Aplee. Br. at 14. There, we held that a reasonable police officer in the defendant's position would have known it was a constitutional violation to arrest someone under Oklahoma's assault statute without clear signs of "force or violence." *Morris*, 672 F.3d at 1193 (quoting Okla. Stat. tit. 21, § 641) (internal quotation marks omitted). The person challenging his arrest in *Morris* was unarmed, did not approach or threaten the officer, and even "backed away with his hands raised in a defensive position" when the officer approached. *Id.* Indeed, given that "assault requires at least *some* attempt to use 'force or violence' to cause harm," we explained in *Morris* that the arrest was especially improper because the plaintiff "exhibited *no* signs of violence or intent to cause harm." *Id.* at 1194 (emphases added). Put another way, we recognized the obvious meaning of "force or violence" and concluded that "nonviolent conduct is not enough for *any* reasonable officer to believe [an individual] [i]s committing an assault." *Id.* (emphasis added) (internal quotation marks omitted).

30

The constitutional violation in *Morris* was patent and egregious. And recognizing that fact is the key to understanding our reasoning there. Far from reflecting a universal endorsement of the sort of broad clearly-established-law analysis that Plaintiffs espouse, *Morris* constitutes an unremarkable, case-specific application of our view that "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). As such, *Morris* cannot avail Plaintiffs on these facts: even assuming *arguendo* that the Officers violated the Fourth Amendment rights of Mr. Quinn and Ms. Gonzalez in effecting their arrests, we would be hard-pressed to conclude that such violations were patent and egregious, given that they took place in the unique context of a larceny sting operation. Accordingly, Plaintiffs' reliance on *Morris* is misguided and unfruitful.

In sum, neither *Lawmaster* nor *Morris* aids Plaintiffs' cause; more specifically, the two cases do not support the generalized approach to clearly-established-law analysis that Plaintiffs propound. Thus, we decline to relieve Plaintiffs of their obligation to identify clearly established law by reference to decisions that at least have a substantial factual correspondence with the instant case, which involves the unique circumstances of a larceny sting operation.

**b**

31

Plaintiffs contend that "voluminous case law" decided before July 30, 2010, should have alerted the Officers to the unconstitutional character of their conduct when they arrested Mr. Quinn and Ms. Gonzalez in the sting operation. Aplee. Br. at 14. Plaintiffs' assertion is patently untenable.

We note that Plaintiffs do not cite specific Supreme Court authority. And, as for their proffered Tenth Circuit cases, we cannot say that these authorities serve as clearly established law on these facts. For example, Plaintiffs cursorily reference three cases that do not involve analogous facts, much less sting operations like the one at issue here. *See Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009) (holding, *inter alia*, that "it has been clear for some time that the use of handcuffs generally converts a detention into an arrest"); *United States v. Davis*, 197 F.3d 1048, 1053 (10th Cir. 1999) (holding that a *search* that "was the product of knowing, specific, unequivocal and uncoerced consent" satisfied the Fourth Amendment); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (discussing false statements in an affidavit for an arrest warrant). Although Plaintiffs allude to the specific-intent dimension of these cases, apparently to suggest that they would have given the Officers fair warning that they did not have probable cause regarding the mens rea element of the larceny offense, as noted *supra*, we cannot confidently conclude that the treatment of specific intent present in such non-sting cases is applicable in the sting context, which at least

32

arguably implicates unique concerns. And Plaintiffs have offered us no reason to map the mens rea reasoning of these cases onto the larceny-sting setting.

Suffice it to say that Plaintiffs' remaining cases—from federal and New Mexico courts—are similarly unavailing: they are factually inapposite and offer no clearly established law that would have provided fair warning to the Officers that their larceny-sting arrests of Mr. Quinn and Ms. Gonzalez were lacking in probable cause. *See, e.g.*, *United States v. Brown*, 234 F. App'x 838, 846–47 (10th Cir. 2007) (per curiam); *Welker*, 689 F.2d at 167–68; *see also Edgerly v. City & Cnty. of S.F.*, 599 F.3d 946, 953–54 (9th Cir. 2010); *State v. Robertson*, 563 P.2d 1175, 1176 (N.M. Ct. App. 1977); *State v. Puga*, 510 P.2d 1075, 1076 (N.M. Ct. App. 1973). Accordingly, we conclude that Plaintiffs have not carried their burden of identifying cases that constitute clearly established law on these facts—*viz.*, cases that would have given the Officers fair warning that, in the context of this larceny sting operation, they lacked probable cause to arrest Mr. Quinn and Ms. Gonzalez. Accordingly, the district court erred in denying the Officers qualified immunity regarding Plaintiffs' Fourth Amendment claim.

## C

The Officers also argue that the challenged district court ruling is legally infirm with respect to its resolution of Plaintiffs' entrapment, malicious-prosecution, and substantive due process claims. The Officers are correct that the district court's dispositional language painted with broad brushstrokes. Indeed,

33

although the court purported to deny the Officers qualified immunity as to all of Plaintiffs' claims, it explicitly addressed the validity of this defense with regard to only Plaintiffs' Fourth Amendment claim. In our view, the district court's treatment of these claims yields two outcomes.

First, we conclude that the entrapment claim is not properly before us on appeal. Because we lack jurisdiction to consider this claim, we must dismiss it. And, second, though we have jurisdiction to address the malicious-prosecution and substantive due process claims, we exercise our discretion not to. In our view, the district court's tacit denial of qualified immunity to the Officers on these two claims makes a limited remand both appropriate and prudent. On remand, the district court is instructed (1) to explicitly assess whether the Officers may avail themselves of qualified immunity on Plaintiffs' malicious-prosecution and substantive due process claims, and (2) to then rule on the claims anew.

**1**

Tracing the procedural history of the entrapment claim has permitted us to resolve the parties' appellate arguments in a relatively straightforward fashion. Our review of the filings in the district court conclusively establishes that Plaintiffs *never* presented their entrapment theory as one implicating the Officers. Rather, in their complaint, Plaintiffs asserted that the Tact Plan was one "established by the [Governmental Defendants] in order to entrap citizens." Aplt. App. at 11; *see id.* at 10 ("The [APD] is a law enforcement agency operated by

34

the City of Albuquerque . . . .  It was the entity which . . . established the policy of conducting the 'Backpack Sting Operation' in order to entrap innocent citizens and others . . . .").  Stated otherwise, at the inception of this lawsuit, Plaintiffs evinced their intent to hold the City of Albuquerque (as well as its subunit the APD) liable for promulgating law-enforcement policies that effectively entrapped innocent individuals.  This litigation approach is emblematic of municipal-liability claims.  *See, e.g.*, *Hogan v. Winder*, 762 F.3d 1096, 1113 (10th Cir. 2014); *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 758–59 (10th Cir. 2014).

Not surprisingly, then, all rejoinder to Plaintiffs' entrapment-based allegations has been cabined to whether such a theory could serve as the predicate for a *municipal*-liability claim.  Defendants unmistakably framed their summary-judgment challenge to these allegations in this way: "Plaintiffs' entrapment theory does not support a municipal liability claim under Section 1983."  Aplt. App. at 41 (Defs.' Mot. for Summ. J., filed July 11, 2012); *see id.* at 41–42 (inviting the court to reject Plaintiffs' "claim in their complaint [that] they were entrapped regarding their arrests and [their] attempt to use this argument to establish municipal liability," and supporting their arguments with municipal-liability cases).  And, in their response brief, Plaintiffs made no attempt to forge a nexus between the Officers' conduct and their assertions of entrapment.  Therefore, it is

35

beyond peradventure that Plaintiffs' entrapment claim has only involved official—*not* individual—actors.

As fully explicated *supra* in Part II.A.1, the nature of our review in the instant appeal is interlocutory. *See Price-Cornelison*, 524 F.3d at 1111. We exercise our "limited jurisdiction," *Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Human Servs.*, 742 F.3d 1239, 1246 (10th Cir. 2014) (internal quotation marks omitted), for essentially one purpose: to assess the propriety of the district court's denial of qualified immunity. This inquiry pertains solely to the Officers for at least two reasons: first, and most fundamentally, only the Officers—not the Governmental Defendants—have sought appellate review; and second, even assuming *arguendo* that the Officers *were* attempting to raise these municipal-liability claims on the Governmental Defendants' behalf, they would be unable to do so on interlocutory appeal. More specifically, as to the second reason, the Officers could not make such an argument in the context of a qualified-immunity interlocutory appeal because, as a matter of law, the Governmental Defendants are not entitled to rely upon the qualified-immunity defense. *See Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) ("While Officer Bateman is entitled to assert the qualified immunity defense, the City is not."); *see also Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009) ("Qualified immunity . . . is

36

available *only* in suits against officials sued in their personal capacities . . . ." (emphasis added)).

All of the foregoing principles unmistakably militate against addressing the merits of Plaintiffs' entrapment claim. To reiterate, Plaintiffs' framing of this claim with an eye toward imposing only municipal liability renders it unsuitable for our review here, where the Officers are the only named appellants and they are challenging on interlocutory appeal only the district court's denial of qualified immunity. Consequently, we dismiss any appeal regarding Plaintiffs' entrapment claim for lack of jurisdiction.

**2**

We reach a different result as to Plaintiffs' malicious-prosecution and substantive due process claims. We conclude that we have jurisdiction to rule on the Officers' interlocutory appeal with respect to these claims. However, because the district court did not articulate its rationale for denying the Officers qualified immunity regarding these claims, we determine that it is prudent and appropriate to remand the case to the district court with instructions to explicitly assess the Officers' assertions of qualified immunity regarding these claims and then enter a decision regarding them.

We indisputably have jurisdiction over these two claims because the district court entered judgment on both: the district court explicitly denied in its entirety the Officers' assertion of qualified immunity, and the Officers had asserted

37

qualified immunity as to *all* of Plaintiffs' claims. Thus, the district court effectively (albeit tacitly) denied the Officers qualified immunity regarding Plaintiffs' malicious-prosecution and substantive due process claims—as well as Plaintiffs' Fourth Amendment claim—even though the court only explicitly addressed the Fourth Amendment claim.

Plaintiffs colorably presented their malicious-prosecution and substantive due process claims to the district court at the outset of the litigation. To be sure, the contours of those claims were not obvious from the face of the complaint. However, in the course of the briefing process, the claims took on appreciable shape. More specifically, in their summary-judgment motion, the Officers clearly asserted qualified immunity as to Plaintiffs' claims of malicious prosecution and substantive due process (as well as Plaintiffs' Fourth Amendment claim). Plaintiffs then commenced a more detailed fleshing-out of both claims in their summary-judgment response brief, and the Officers duly addressed Plaintiffs' arguments in their reply brief. Thus, by the time the Officers' summary-judgment motion was ripe for decision, the district court had before it the Officers' assertions of qualified immunity as to not only Plaintiffs' Fourth Amendment claim, but also Plaintiffs' malicious-prosecution and substantive due process claims. The court then proceeded to deny the Officers' summary-judgment motion in full—thereby effectively adjudicating the Officers' assertions of qualified immunity as to *all* of Plaintiffs' claims.

38

But, in adjudicating these claims, the district court faltered in a critical respect—*viz.*, it limited its express reasoning to the Fourth Amendment claim, offering us nothing to review but its bare judgment with respect to the other claims. Under these circumstances, and given the complexities of this case related to a larceny sting operation, we believe that it would be inappropriate and imprudent for us to address in the first instance the merits of the Officers' appeal from the district court's qualified-immunity ruling regarding Plaintiffs' malicious-prosecution and substantive due process claims. *See Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 425–26 (10th Cir. 2006) (noting, when the district court did not articulate any rationale on the raised issue of *forum non conveniens*, that "it would be inappropriate for us to address the matter in the first instance"). Accordingly, we remand the case to the district court with instructions to explicitly assess the Officers' assertions of qualified immunity with respect to these two claims and then rule on them anew.

## III

We **REVERSE** the district court's denial of summary judgment to Officers Young and Melendrez on Plaintiffs' Fourth Amendment claim and direct the court to enter judgment in favor of the Officers on this claim (that is, to grant them qualified immunity). We **DISMISS** the portion of the appeal relating to Plaintiffs' entrapment claim for lack of appellate jurisdiction. Finally, we **REMAND** the case to the district court with instructions to expressly analyze the

39

Officers' assertions of qualified immunity with respect to Plaintiffs' malicious-prosecution and substantive due process claims and then rule on them anew.